DMP:CRH/NJM
F. #2018R000578

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | I N D I C T M E N T |
| | |
| - against - | Cr. No. _____ |
| | (T. 18, U.S.C., §§ 371, 545, 554(a), |
| NAZEM AHMAD, | 981(a)(1)(C), 982(a)(1), 982(a)(2)(B), |
|     also known as "N.A.," "Naz," "Naz | 982(b)(1), 1349, 1956(h), 2 and 3551 et |
|     Ahmad," "Nazem Ali Ahmad," "Nazem | seq.; T. 21, U.S.C., § 853(p); T. 28, |
|     Saeed Ahmad," "Nazim Sa'id Ahmad," | U.S.C., § 2461(c); T. 50, U.S.C., |
|     "Nizam Saed Ahmad," "Nazem Said | §§ 1705(a) and 1705(c)) |
|     Ahmed," "Nazem Saied Ahmed," "Nazeem | |
|     Said Ahmad" and "Kariumu Muhamadi," | |

NAZEM AHMAD,
    also known as "N.A.," "Naz," "Naz
    Ahmad," "Nazem Ali Ahmad," "Nazem
    Saeed Ahmad," "Nazim Sa'id Ahmad,"
    "Nizam Saed Ahmad," "Nazem Said
    Ahmed," "Nazem Saied Ahmed," "Nazeem
    Said Ahmad" and "Kariumu Muhamadi,"
FIRAS MICHAEL AHMAD,
    also known as "Firas Ahmed" and "Firas
    Nazem Ahmad,"
HIND NAZEM AHMAD,
    also known as "Dida Ahmad," "Hind El
    Ris," "Hind El-Riz" and "Julie,"
RAMI YAACOUB BAKER,
    also known as "Ramy Kamel Yaqoub
    Baker,"
MOHAMAD HIJAZI,
MOHAMAD HASSAN ISMAIL,
SARYA NEMAT MARTIN,
    also known as "Sarya N. Marie,"
ALI SAID MOSSALEM and
SUNDAR NAGARAJAN,
    also known as "Nagarajan Sundar
    Poongulam Kasiviswanathan Naga" and
    "Sundar Poongulam K. Nagarajan
    Nagarajan,"

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.        The Defendants and Other Relevant Entities

1.        The defendant NAZEM AHMAD, also known as "N.A.," "Naz," "Naz Ahmad," "Nazem Ali Ahmad," "Nazem Saeed Ahmad," "Nazim Sa'id Ahmad," "Nizam Saed Ahmad," "Nazem Said Ahmed," "Nazem Saied Ahmed," "Nazeem Said Ahmad" and "Kariumu Muhamadi" ("AHMAD"), was a citizen and resident of Lebanon and a citizen and national of Belgium.  Additionally, a Ugandan passport, bearing AHMAD's photograph, was previously issued under the name Kariumu Muhamadi.

2.        On or about December 13, 2019, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") designated AHMAD as a Specially Designated National ("SDN") pursuant to Executive Order 13224 for his material support of, and provision of goods and services to, Hizballah, a Lebanon-based terrorist group, which, as discussed further below, was previously designated as a Foreign Terrorist Organization ("FTO") and a Specially Designated Global Terrorist ("SDGT").

3.        Also, on or about December 13, 2019, OFAC designated the following 11 entities for being owned, controlled or directed by AHMAD: Beirut Diam SAL, Beirut Gem SAL, Montecarlo Beach SAL, Debbiye 143 SAL, Nour Holding SAL, Aramoun 1506 SAL, Damour 850 SAL, Gebaa 2480 SAL, Noumayriye 1057 SAL, Beirut Trade SAL and Blue Star Diamond SAL – Offshore (collectively, the "Sanctioned Entities").

4.        AHMAD was involved in real estate development, the international trade of diamonds and the international sale and acquisition of artwork.  Directly and/or through corporate entities, AHMAD controlled, operated or was the beneficiary of more than two dozen corporate entities registered or operating in, among other places, Belgium, Hong Kong, Ivory Coast, Lebanon, South Africa and the United Arab Emirates (together, the "Ahmad Entities").

5.      The defendant FIRAS MICHAEL AHMAD, also known as "Firas Ahmed" and "Firas Nazem Ahmad" ("FIRAS"), was a dual citizen of Lebanon and Belgium and a resident of South Africa.  FIRAS was the son of NAZEM AHMAD and assisted with the operation of the Ahmad Entities.

6.      The defendant HIND NAZEM AHMAD, also known as "Dida Ahmad," "Hind El Ris," "Hind El-Riz" and "Julie" ("HIND"), was a citizen of Belgium and a resident of the Ivory Coast.  HIND was the daughter of NAZEM AHMAD, operated Dida Gallery, Artual Gallery and Four You Gallery, and assisted with the operation of the Ahmad Entities.

7.      The defendant RAMI YAACOUB BAKER, also known as "Ramy Kamel Yaqoub Baker" ("BAKER"), was a dual citizen of Lebanon and Belgium and a resident of Lebanon.  BAKER was AHMAD's brother-in-law and assisted with the operation of the Ahmad Entities.

8.      The defendant MOHAMAD HASSAN ISMAIL ("ISMAIL") was a citizen and resident of Lebanon.  ISMAIL was an accountant who assisted with the operation of the Ahmad Entities.

9.      The defendant MOHAMAD HIJAZI ("HIJAZI") was a citizen and resident of Lebanon.  HIJAZI assisted with the operation of the Ahmad Entities.

10.     The defendant SARYA NEMAT MARTIN, also known as "Sarya N. Marie" ("MARTIN"), was a citizen of the United States.  MARTIN assisted with the operation of art galleries that were part of the Ahmad Entities.

11.     The defendant ALI SAID MOSSALEM ("MOSSALEM") was a citizen and resident of Lebanon.  MOSSALEM was an accountant who assisted with the operation of the Ahmad Entities.

12.     The defendant SUNDAR NAGARAJAN, also known as "Nagarajan Sundar Poongulam Kasiviswanathan Naga" and "Sundar Poongulam K. Nagarajan" ("NAGARAJAN"), was a citizen of India and a resident of the United Kingdom.  NAGARAJAN was an accountant who assisted with the operation of the Ahmad Entities.

II.     Hizballah, IEEPA and the Global Terrorism Sanctions Regulations

13.     Hizballah was a Lebanon-based terrorist group that received weapons, training and funding from Iran, which the Secretary of State designated as a State Sponsor of Terrorism in 1984.  Hizballah maintained a large terrorist network and was responsible for multiple large-scale attacks, including the 1983 suicide truck bombings of the U.S. Embassy Beirut and the U.S. Marine Corps barracks in Beirut; the 1984 attack on the U.S. Embassy Beirut annex; and the 1985 hijacking of TWA Flight 847.

14.     On October 8, 1997, the United States Secretary of State designated Hizballah as an FTO under Section 219 of the Immigration and Nationality Act.  On October 31, 2001, Hizballah was designated an SDGT pursuant to Executive Order 13224.  To date, Hizballah remains a designated FTO and SDGT.  The FTO designation included the following aliases: Party of God, Islamic Jihad, Islamic Jihad Organization, Revolutionary Justice Organization, Organization of the Oppressed on Earth, Islamic Jihad for the Liberation of Palestine, Organization of Right Against Wrong, Ansar Allah and Followers of the Prophet Muhammad.  On May 16, 2017, the Secretary of State amended the designation of Hizballah to include the following aliases: Lebanese Hizballah, also known as Lebanese Hezbollah, also known as LH; Foreign Relations Department, also known as FRD; and External Security Organization, also known as ESO, also known as Foreign Action Unit, also known as Hizballah ESO, also known as Hizballah International, also known as Special Operations Branch, also known as External Services Organization, also known as External Security Organization of Hezbollah.

15.     The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

16.     On September 23, 2001, pursuant to IEEPA and other statutes, the President issued Executive Order 13224, which declared a national emergency with respect to the threat to the national security, foreign policy and economy of the United States posed by grave acts of terrorism and threats of terrorism committed by foreign terrorists and the continuing and immediate threat of further attacks on U.S. nationals or the United States.  Executive Order 13224, Section 1, stated, in relevant part, that "all property and interests in property of [persons determined by the Executive Branch to have committed terrorism and those who support, act on behalf of, or are otherwise associated with such persons] that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons are blocked."  See 66 Fed. Reg. 49,079 (Sept. 25, 2001).  Further, Executive Order 13224, Section 2, prohibited: (a) "any transaction or dealing by United States persons or within the United States in property or interests in property blocked pursuant to [the Order], including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons" determined to be subject to the Order; (b) "any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in" the Order; and (c) "any conspiracy formed to violate any of the prohibitions set forth in" the Order.  Id.

17.     In October 2001, the Secretary of State designated Hizballah as an SDGT pursuant to Executive Order 13224 because it had committed, or posed a significant risk of committing, acts of terrorism that threatened the security of U.S. nationals or the national security, foreign policy or economy of the United States.  See 67 Fed. Reg. 12,633 (Mar. 19, 2002).

18.     To implement Executive Order 13224, OFAC issued the Global Terrorism Sanctions Regulations ("GTSR"), Title 31, Code of Federal Regulations, Part 594.  Executive Order 13224 and the GTSR provide OFAC with the authority to designate persons who, among other things, provide support or services to or in support of an SDGT.  31 C.F.R. § 594.201(a)(3). The names of persons designated by OFAC, whose property and interests in property were therefore blocked, are published in the Federal Register and incorporated into the Specially Designated Nationals and Blocked Persons List ("SDN List"), which is published on OFAC's website.  Id. Note 2.  On or about December 13, 2019, AHMAD and the Sanctioned Entities were designated by OFAC pursuant to Executive Order 13224 and added to the SDN List.  See 84 Fed. Reg. 70,266 (Dec. 20, 2019).

19.     The GTSR incorporated the prohibitions of Executive Order 13224; thus, any U.S. person was prohibited from engaging in any transaction with, or dealing in property or interests in property of, SDNs, including "[t]he making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any [SDN]" or "[t]he receipt of any contribution or provision of funds, goods, or services from any [SDN.]"  31 C.F.R. § 594.204; see also 31 C.F.R. 594.406 (indicating that the prohibitions of the GTSR "appl[ied] to services performed in the United States or by U.S. persons, wherever located").  The GTSR also prohibited any transaction by any U.S. person or within the United States that evades or avoids, has the purpose of evading

or avoiding, or attempts to violate any of the prohibitions set forth in the GTSR and further prohibited conspiring to engage in any transactions prohibited by the GTSR.  31 C.F.R. § 594.205.

20.     The national emergency described in Executive Order 13224 with respect to the threat that foreign terrorism presents to the United States has remained in continuous effect since 2001, and Executive Order 13224 was modernized and amended in non-material ways in 2019 by Executive Order 13886.  See 84 Fed. Reg. 48,041 (Sept. 12, 2019).

III.     The AHMAD Criminal Organization

A.     Summary of the Criminal Conspiracy

21.     As detailed below, the defendant NAZEM AHMAD, together with defendants FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, SARYA NEMAT MARTIN, ALI SAID MOSSALEM and SUNDAR NAGARAJAN, together with others, engaged in a longstanding scheme to defraud the United States and foreign governments, to evade U.S. sanctions and customs laws and to conduct money laundering transactions.

22.     The defendant NAZEM AHMAD, together with defendants FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, SARYA NEMAT MARTIN, ALI SAID MOSSALEM and SUNDAR NAGARAJAN and others, used numerous corporate entities and individuals (collectively, including the defendants, the "AHMAD Criminal Organization") to carry out this criminal scheme, including to disguise AHMAD's control and beneficial interest in the companies and in financial transactions.  After AHMAD was sanctioned in December 2019 for his provision of support and services to Hizballah, the defendants used multiple individuals and corporate entities to act as pass-throughs to obscure AHMAD's role and facilitate the acquisition of valuable goods from the United States and conduct other transactions involving U.S. persons for AHMAD's

benefit, notwithstanding that such transactions constituted violations of U.S. sanctions and other federal laws.

23.      The defendant NAZEM AHMAD, together with defendants FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, SARYA NEMAT MARTIN, ALI SAID MOSSALEM and SUNDAR NAGARAJAN and others, engaged in this scheme to benefit various business ventures controlled by and for the benefit of AHMAD, including the sale of diamonds; to acquire valuable goods, including fine art; to obscure AHMAD's involvement in transactions; to avoid paying taxes to certain foreign governments on the import of valuable goods into foreign countries; and to make it more difficult for the United States government to carry out its lawful functions.

24.      The defendants benefitted financially from the criminal scheme. After the defendant NAZEM AHMAD was sanctioned in December 2019, entities controlled by or operating for the benefit of AHMAD engaged in more than $400 million worth of financial transactions between approximately January 2020 and August 2022. The AHMAD Criminal Organization, including the defendants, was responsible for importing more than $207 million of goods to the United States and exporting more than $234 million of goods from the United States between approximately December 2019 and December 2022, consisting primarily of diamonds and artwork. Approximately $160 million worth of these transactions involved the U.S. financial system. At least approximately $6 million of the proceeds of this criminal scheme was transferred to Lebanon for use by AHMAD and his associates operating there during this time frame.

B.      AHMAD's Association with Hizballah

25.      Defendant NAZEM AHMAD associated with high-level members of Hizballah, many of whom were sanctioned by OFAC for their facilitation of terrorism through Hizballah. For example, AHMAD personally associated with, among others (i) Muhammad Hasan

Ra'd, a representative for Hizballah in the Lebanese Parliament and a member of the inner circle of Hizballah's supreme leader, Secretary General Hasan Nasrallah; and (ii) Abdallah Safi-Al-Din, Hizballah's representative to Iran, who acted as a conduit between Iran and Hizballah.  Both individuals were designated by OFAC for their work for Hizballah.

26.     Defendant NAZEM AHMAD's support for Hizballah was also reflected in materials he possessed, including a Hizballah-associated funeral video, a video celebrating a Hizballah martyr, video of Ra'd speaking at a Hizballah funeral, video of Hasan Nasrallah giving a speech, photographs of uniformed Hizballah fighters carrying firearms, and a photograph of AHMAD with defendant RAMI YAACOUB BAKER, Ra'd and Safi-Al-Din.

27.     Defendant HIND NAZEM AHMAD also was affiliated with Hizballah members and associates who were sanctioned by OFAC.   HIND and defendant SUNDAR NAGARAJAN possessed a list including names and telephone numbers of several individuals associated with Hizballah, including (i) senior Hizballah member and SDGT Adham Tabaja; (ii) Kassem Tajideen, a financial contributor to Hizballah designated by OFAC as an SDN on or about May 27, 2009; (iii) Hussein Tajideen, a financial contributor to Hizballah designated by OFAC as an SDN on or about December 9, 2010; and (iv) Mohamad Bazzi, a financial contributor to Hizballah, designated by OFAC as an SDN on or about May 17, 2018.

28.     When OFAC designated the defendant NAZEM AHMAD as an SDN on or about December 13, 2019, it explained:

> Ahmad, a diamond dealer, is a prominent Lebanon-based money launderer and significant Hizballah financier.  As of late 2016, Ahmad was considered a major Hizballah financial donor who laundered money through his companies for Hizballah and provided funds personally to Hizballah Secretary-General Hassan Nasrallah (Nasrallah).  Ahmad was also involved in "blood diamond" smuggling and formerly ran businesses in Belgium that benefitted Hizballah.  Ahmad stores some of his personal funds in high-value art in a pre-emptive attempt to mitigate

the effects of U.S. sanctions, and he opened an art gallery in Beirut, Lebanon as a front to launder money.

C.    AHMAD's Control Over and Benefit from the AHMAD Criminal Organization

29.    The AHMAD Criminal Organization conducted its criminal activity through multiple layers of individuals and corporate entities to acquire and sell valuable goods, such as diamonds and artwork, and to engage in financial transactions without revealing defendant NAZEM AHMAD's interest in the activity.

30.    The defendant NAZEM AHMAD owned and indirectly controlled numerous corporate entities, including entities engaged in the diamond trade, and also financially benefited from the same corporate entities, including through the acquisition of artwork through those entities.  Several illustrative but not exhaustive examples include:

(a)    White Star DMCC.    Defendants NAZEM AHMAD and MOHAMED HIJAZI were both identified as the owner of White Star DMCC on documents maintained by at least one of White Star DMCC's business partners.  Transactions associated with White Star DMCC were directed or facilitated by defendant NAZEM AHMAD, his family members, including defendants FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD and RAMI YAACOUB BAKER, and other close advisors, including defendants HIJAZI, MOHAMAD HASSAN ISMAIL, ALI SAID MOSSALEM and SUNDAR NAGARAJAN.  White Star DMCC was used to purchase art for AHMAD's benefit.

(b)    Best Diamond House DMCC.  Defendant NAZEM AHMAD was identified as the owner of Best Diamond House DMCC on documents maintained by at least one of Best Diamond House DMCC's business partners.  The defendant FIRAS MICHAEL AHMAD was identified as "Senior Leadership" and a client contact for Best Diamond House DMCC. Transactions associated with Best Diamond House DMCC were directed by AHMAD, his family

members, including defendants FIRAS, HIND NAZEM AHMAD and RAMI YAACOUB BAKER, and other close advisors, including defendants MOHAMAD HASSAN ISMAIL, ALI SAID MOSSALEM and SUNDAR NAGARAJAN. Best Diamond House DMCC purchased artwork on behalf of AHMAD, and HIND also purchased artwork on behalf of AHMAD and billed the transaction to Best Diamond House DMCC.

(c) Mega Gems Pty Ltd. Defendant FIRAS MICHAEL AHMAD was identified as a "Director" and shareholder of Mega Gems Pty Ltd., and defendant RAMI YAACOUB BAKER was identified as a shareholder of Mega Gems Pty Ltd. on documents maintained by at least one of Mega Gems Pty Ltd.'s business partners. On June 1, 2017, BAKER emailed draft corporate documents including a shareholders agreement to an email account used by defendant NAZEM AHMAD and other members of the AHMAD Criminal Organization. Records maintained by defendant SUNDAR NAGARAJAN tracked diamonds provided by Mega Gems Pty Ltd. to a U.S.-based diamond grading company with a facility in New York, New York ("Diamond Grading Company-1"), an entity the identity of which is known to the Grand Jury, including after AHMAD was designated by OFAC in December 2019. Mega Gems Pty Ltd., through NAGARAJAN and defendant ALI SAID MOSSALEM among others, also purchased artwork on behalf of AHMAD. FIRAS, AHMAD, BAKER, MOSSALEM, NAGARAJAN, MOHAMAD HIJAZI and MOHAMAD HASSAN ISMAIL participated in Mega Gems Pty Ltd. transactions. Mega Gems Pty Ltd. also employed and sponsored for a visa at least one former employee of one of the Sanctioned Entities -- i.e., an employee of Mega Gems Pty Ltd. had previously worked for Blue Star Diamond SAL – Offshore, a company sanctioned because of its ties to AHMAD.

(d)   <u>House of Art Ltd.</u>   Defendant NAZEM AHMAD, together with defendants SUNDAR NAGARAJAN, RAMI YAACOUB BAKER and others, participated in the creation of House of Art Ltd. in Hong Kong.  As of June 2018, Defendant NAZEM AHMAD was the primary contact for House of Art Ltd. for an auction house based in the United States that did business with House of Art Ltd.  House of Art Ltd. purchased artwork on behalf of AHMAD, and defendants HIND NAZEM AHMAD and NAGARAJAN participated in House of Art Ltd. transactions.

(e)   Redacted Company-1 .  Redacted Company-1 engaged in diamond transactions for the benefit of defendant NAZEM AHMAD.  FIRAS AHMAD has served as a representative  for   Redacted Company-1   with Diamond Grading Company-1; another representative of Redacted Company-1 was also a representative for Mega Gems Pty Ltd.  Between approximately 2014 and 2022, transactions associated with Redacted Company-1 were directed by AHMAD, family members including defendants FIRAS and RAMI YAACOUB BAKER, and close advisors, including defendants MOHAMAD HIJAZI and SUNDAR NAGARAJAN.

(f)   Redacted Company-2   .   Redacted Company-2 engaged in diamond transactions for the benefit of defendant NAZEM AHMAD. Transactions by  Redacted Company-2   were directed by individuals, including defendant FIRAS MICHAEL AHMAD, associated with other entities controlled by the AHMAD Criminal Organization, including Redacted Company-1  Mega Gems Pty Ltd., and White Star DMCC, and were tracked by the AHMAD Criminal Organization, including by defendant SUNDAR NAGARAJAN.  Redacted Company-2   was involved in a complex chain of transactions related to a 108.88-carat diamond controlled and eventually sold by the AHMAD Criminal Organization.  Redacted Company-2   was also used by the AHMAD Criminal

Organization to obtain the services of Diamond Grading Company-1 after AHMAD was sanctioned in December 2019, such that its volume of submissions to Diamond Grading Company-1 went up measurably at the same time that those of Redacted Company-1 and Mega Gems Pty Ltd. dropped precipitously.

IV.    Knowledge of U.S. Sanctions Against AHMAD

31.    Defendants NAZEM AHMAD, FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, SARYA NEMAT MARTIN, ALI SAID MOSSALEM and SUNDAR NAGARAJAN knew that AHMAD was an SDN sanctioned by OFAC, and therefore that they could not cause U.S. persons to engage in transactions, including the provision of goods and services, that would benefit AHMAD.  Notice of the designation was sent to AHMAD, and notice was also made to FIRAS, HIND, HIJAZI, ISMAIL, MARTIN, MOSSALEM and NAGARAJAN through communications by other individuals and entities with knowledge of the designation, including in emails in approximately December 2019 and January 2020.  AHMAD acknowledged multiple times that he had been sanctioned in subsequent communications.

V.    Evasion of the Global Terrorism Sanctions Regulations in the Diamond Trade

32.    Defendants NAZEM AHMAD, FIRAS MICHAEL AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, ALI SAID MOSSALEM and SUNDAR NAGARAJAN, together with others, conspired to violate and evade U.S. sanctions by obtaining grading determinations and other services from Diamond Grading Company-1, or otherwise assisted in the operation of diamond companies controlled by the AHMAD Criminal Organization.  The diamonds were provided by several entities that operated for the benefit of AHMAD.

33.     Diamond Grading Company-1 was based in the United States and had several branches in other countries around the world.  Under the GTSR, it was an "entity located in the United States" that was prohibited from performing services, including services performed by its "overseas branch[es]," for designated persons, including the defendant NAZEM AHMAD and the Sanctioned Entities.  31 C.F.R. § 594.406.  Diamond Grading Company-1 was also prohibited from receiving any funds or goods from designated persons, including AHMAD and the Sanctioned Entities.  Id.

34.     The services of Diamond Grading Company-1 were valuable to the defendant NAZEM AHMAD and the other defendants because cut, color and clarity grades assigned by the company, as well as the certification of the stone's carat weight, affected the price at which a diamond could be sold.  Diamond Grading Company-1 also provided other services, such as origin reports and letters detailing especially noteworthy or unique diamonds, which could increase the sales price of particular diamonds.  Obtaining the services of Diamond Grading Company-1 thus increased the amount that AHMAD could receive for the sale of his property.

35.     Specifically, the defendant NAZEM AHMAD relied upon entities, including House of Art, Redacted Company-1   Mega Gems Pty Ltd., and Redacted Company-2 to provide diamonds to Diamond Grading Company-1 after AHMAD was designated in December 2019, while obscuring AHMAD's beneficial interest in those entities.

36.     Collectively, the AHMAD Criminal Organization sent approximately 482 diamond submissions to Diamond Grading Company-1 facilities located in the United States and other countries, after the defendant NAZEM AHMAD was designated in December 2019.  Hundreds of diamonds were imported into the United States through John F. Kennedy

International Airport, in Queens, New York, and sent to a Diamond Grading Company-1 facility located in New York, New York, and subsequently exported back out of the United States.

37.    The total weight of the diamonds submitted by the AHMAD Criminal Organization and graded by Diamond Grading Company-1 after the defendant NAZEM AHMAD was sanctioned was approximately 1,546 carats, worth more than $91 million.

A.    Mega Gems Pty Ltd

38.    Between approximately 2020 and 2022, after defendant NAZEM AHMAD was sanctioned by OFAC, Mega Gems Pty Ltd. caused Diamond Grading Company-1 to perform services on diamonds, such as diamond grading, more than 100 times on behalf of and for the benefit of AHMAD.  In total, Mega Gems Pty Ltd. caused Diamond Grading Company-1 to grade diamonds weighing 140.26 total carats, ranging in size from 0.23 carats to 5.02 carats.

39.    For example, in or about May 2022, Diamond Grading Company-1 performed services for Mega Gems Pty Ltd. on a 4.07-carat, emerald-cut diamond with a color grade of "D" and a clarity grade of "Flawless."  By comparison, an emerald-cut diamond with the same carat, color and clarity would be valued at more than $350,000.

40.    As another example, Diamond Grading Company-1 performed services for a 2.03-carat, round brilliant-cut diamond in or about July 2022.  The diamond received a color grade of "D" and a clarity grade of "Internally Flawless."  By comparison, a round brilliant-cut diamond with the same carat, color and clarity would be valued at more than $90,000.

B.    Redacted Company-1

41.    Between approximately 2020 and 2022, after defendant NAZEM AHMAD was sanctioned by OFAC, Redacted Company-1 caused Diamond Grading Company-1 to conduct approximately 100 gradings of diamonds on behalf of and for the benefit of AHMAD.  In total,

Redacted Company-1 caused Diamond Grading Company-1 to grade diamonds weighing 197.96 total carats, ranging in size from 0.33 carats to 3.51 carats.

42.     For example, Diamond Grading Company-1 performed services in or about July 2022 for a 3.05-carat, round brilliant-cut diamond.  The diamond received a color grade of "D" and a clarity grade of "Flawless."  By comparison, a round brilliant-cut diamond with the same carat, color and clarity would be valued at more than $230,000.

43.     Diamond Grading Company-1 also performed services in or about June 2022 for a 2.2-carat, round brilliant-cut diamond.  The diamond received a color grade of "D" and a clarity grade of "Internally Flawless."  By comparison, a round brilliant-cut diamond with the same carat, color and clarity would be valued at more than $99,000.

C.     Redacted Company-2

44.     Between approximately 2020 and 2022, after defendant NAZEM AHMAD was sanctioned by OFAC, Redacted Company-2 caused Diamond Grading Company-1 to perform services on diamonds more than 250 times on behalf of and for the benefit of AHMAD.  During that time period, Redacted Company-2 submitted to Diamond Grading Company-1 for services diamonds ranging in size from 0.36 carats to 45.56 carats.

45.     On or about March 18, 2021, Redacted Company-2 shipped a 45.56-carat diamond (the "45 Carat Diamond") to a facility belonging to Diamond Grading Company-1 in New York.  The shipment was imported through John F. Kennedy International Airport, in Queens, New York.  Records associated with the shipment declared the value of the 45 Carat Diamond to be $80 million.  On or about April 26, 2021, the 45 Carat Diamond was exported out of the United States, through John F. Kennedy International Airport back to Redacted Company-2

46.     Records known to have been in the possession of defendant FIRAS MICHAEL AHMAD reflect that FIRAS and Mega Gems Pty Ltd. had a beneficial interest in the 45 Carat Diamond.

VI.     Evasion of the Global Terrorism Sanctions Regulations in the Purchase of Fine Art

47.     The defendants NAZEM AHMAD, FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, SARYA NEMAT MARTIN, ALI SAID MOSSALEM and SUNDAR NAGARAJAN conspired to violate and evade U.S. sanctions by engaging in transactions—specifically the acquisition of fine art from the United States and other countries—on behalf of and for the benefit of AHMAD.

48.     In so doing, the defendants agreed to violate the applicable sanctions regime in at least two ways.  First, the defendants agreed to contract for shipment of goods, including artwork, from the United States and from U.S. persons outside of the United States on behalf of and for the benefit of AHMAD.  Second, the defendants agreed to purchase artwork from outside the United States and conducted financial transactions, such as wire transactions, that settled with correspondent banks in the United States on behalf of and for the benefit of AHMAD.

A.     The Defendants' Acquisition of Art from the United States and U.S. Persons

49.     The defendant NAZEM AHMAD, together with defendants HIND NAZEM AHMAD, MOHAMAD HASSAN ISMAIL, ALI SAID MOSSALEM and SUNDAR NAGARAJAN caused the sale, export and transfer of artwork from the United States to AHMAD.

50.     According to export records and sales invoices, artwork obtained from the United States by the AHMAD Criminal Organization, after the defendant NAZEM AHMAD was sanctioned in December 2019, was valued at more than $450,000.  The AHMAD Criminal Organization also obtained an additional $780,000 in artwork from U.S. persons after AHMAD was sanctioned.  However, those amounts understate the actual total value of the artwork because

part of the criminal scheme involved evading taxes imposed by foreign governments by undervaluing the artwork.

        a.     <u>AHMAD's Acquisition of Art from Chicago Art Gallery-1</u>

        51.     In or about and between April 2021 and July 2021, the defendants NAZEM AHMAD, MOHAMAD HASSAN ISMAIL and ALI SAID MOSSALEM engaged in multiple transactions with a Chicago-based art gallery, an entity the identity of which is known to the Grand Jury ("Chicago Art Gallery-1"), on behalf of and for the benefit of AHMAD.

        52.     In or about April and May 2021, defendant NAZEM AHMAD requested that Chicago Art Gallery-1 commission several paintings from a U.S.-based artist. AHMAD engaged in numerous communications related to the work he requested from the U.S.-based artist and Chicago Art Gallery-1, including criticizing the quality of the work and requesting specific changes to the paintings. Below are images of two of the paintings commissioned by AHMAD:

 

53.     The defendant NAZEM AHMAD and Chicago Art Gallery-1 agreed AHMAD would pay $7,500 each for 10 commissioned paintings—i.e., $75,000 in total.

54.     In or about and between May 2021 and July 2021, the defendant NAZEM AHMAD engaged in multiple communications with the owner of Chicago Art Gallery-1 about shipping paintings to AHMAD.  During the course of these communications, AHMAD and the owner of Chicago Art Gallery-1 discussed how AHMAD directed Chicago Art Gallery-1 to invoice and ship the paintings to a business that did not appear to be affiliated with AHMAD.

55.     On or about and between May 26, 2021 and July 13, 2021, the defendant ALI SAID MOSSALEM engaged in multiple communications with the owner of Chicago Art Gallery-1 regarding the shipment from Chicago Art Gallery-1 of artwork that the defendant NAZEM AHMAD had previously discussed acquiring.

56.     On or about July 16, 2021, Chicago Art Gallery-1 sent the defendant NAZEM AHMAD photographs of an invoice for four paintings, with no prices listed, along with nine certificates of authenticity for various works of art.

57.     On or about July 27, 2021, the defendant NAZEM AHMAD provided a draft email to Chicago Art Gallery-1 to be sent to the defendant MOHAMAD HASSAN ISMAIL regarding instructions for the shipment of paintings from the United States to Lebanon for AHMAD.  That same day, the owner of Chicago Art Gallery-1 sent the invoices and the shipment instructions to defendant ISMAIL.

58.     On or about September 28, 2021, Chicago Art Gallery-1 exported a shipment, which was declared to be paintings with a declared value of $22,500, from Illinois to an entity in Lebanon called Baconia SARL, an entity used by defendant NAZEM AHMAD to acquire artwork.

59.     On or about October 27, 2021, a photograph posted on defendant NAZEM
AHMAD's social media account shows AHMAD seated at a desk with artwork from Chicago Art
Gallary-1 hanging on the wall in front of AHMAD, as depicted below:



60.     In or about and between February 2021 and January 2022, entities
controlled or operated for the benefit of defendant NAZEM AHMAD paid in excess of $241,000
to the owner of Chicago Art Gallery-1.  At least some of the money paid by the AHMAD Criminal
Organization to Chicago Art Gallery-1 was paid indirectly, via a third party, in multiple increments
below $10,000, which avoided U.S. financial reporting requirements and obscured AHMAD's role
in the transactions.

b.      AHMAD's Acquisition of Art from New York Artist-1

61.      In or about and between February 2021 and November 2021, the defendants NAZEM AHMAD, ALI SAID MOSSALEM and HIND NAZEM AHMAD engaged in transactions with a New York-based artist, an individual whose identity is known to the Grand Jury ("New York Artist-1"), on behalf of and for the benefit of AHMAD.

62.      On or about February 24, 2021, the defendant NAZEM AHMAD contacted New York Artist-1 and asked to purchase one of New York Artist-1's pieces of art.  New York Artist-1 indicated that the artwork was priced at $30,000, offered to provide a list of additional artwork that was for sale and requested an email address.  AHMAD responded, in relevant part, that New York Artist-1 should not "mention [AHMAD's] name to the gallery or anyone [because he] prefer[s] to be anonymous."

63.      According to an invoice known to have been in the possession of defendant ALI SAID MOSSALEM, dated February 28, 2021, a Sierra Leone-based entity used by AHMAD to acquire artwork, was charged $199,800 by a New York-based art gallery, an entity the identity of which is known to the Grand Jury ("New York Art Gallery-1"), for the purchase of six works of art by New York Artist-1.

64.      On or about June 11, 2021, six paintings valued at $199,800 were exported from the United States, via John F. Kennedy International Airport, by New York Art Gallery-1 to Baconia SARL, the same business entity in Lebanon that AHMAD used to illegally acquire artwork from Chicago Art Gallery-1.

65.      Between approximately January 2021 and March 2021, the defendant NAZEM AHMAD was in possession of artwork acquired from New York Artist-1, as reflected in the below photographs of the artwork hanging at his residence in Lebanon (AHMAD is seated in front of the artwork alongside defendant FIRAS MICHAEL AHMAD):





66.     In or about and between July and August 2021, defendant HIND NAZEM

AHMAD participated in a series of email communications with New York Artist-1 and a

representative of Four You Gallery, a Lebanese-based art gallery that is associated with defendants

NAZEM AHMAD and HIND.  New York Artist-1 requested from Four You Gallery a list of the

collectors who purchased New York Artist-1's artwork.  In response, defendant SARYA NEMAT

MARTIN provided a list, which indicated that eight of New York Artist-1's pieces of art were purchased by "Nazem Ahmad" of Lebanon.

           c.      <u>AHMAD's Acquisition of Art from Brooklyn Artist-1</u>

67.     In or about and between October 2021 and March 2022, the defendants NAZEM AHMAD and ALI SAID MOSSALEM engaged in transactions with New York Art Gallery-1 to acquire artwork by a Brooklyn-based artist, an individual whose identity is known to the Grand Jury ("Brooklyn Artist-1"), on behalf of and for the benefit of AHMAD.

68.     On or about and between October 21, 2021 and November 16, 2021, New York Art Gallery-1 presented an exhibition of artwork by several artists, including New York Artist-1 and Brooklyn Artist-1.

69.     According to an invoice in the possession of defendant ALI SAID MOSSALEM, dated October 22, 2021, New York Art Gallery-1 sought payment of $46,800 for three works of art by Brooklyn Artist-1 from Baconia SARL, the same business entity in Lebanon that defendant NAZEM AHMAD used to illegally acquire artwork from Chicago Art Gallery-1 and New York Artist-1.  Images of that artwork are depicted below:

  

70.     On or about March 15, 2022, a shipment described as three pieces of artwork with a declared value of $46,800 was exported from the United States by New York Gallery-1 to another entity utilized by defendant NAZEM AHMAD located in Lebanon.  The shipment was facilitated by a freight forwarding agent located in Valley Stream, New York, and departed the United States from John F. Kennedy International Airport, in Queens, New York.

      d.    <u>AHMAD's Acquisition of Certificate of Authenticity from Brooklyn Artist-2</u>

71.     On or about and between December 10, 2019 and March 11, 2020, the defendants NAZEM AHMAD, HIND NAZEM AHMAD, SUNDAR NAGARAJAN and ALI SAID MOSSALEM acquired from a Brooklyn-based artist, an individual whose identity is known to the Grand Jury ("Brooklyn Artist-2"), a certificate of authenticity ("COA") for artwork AHMAD had purchased in November 2013.  The COA was valuable because AHMAD intended to sell Brooklyn Artist-2's artwork, and the COA permitted AHMAD to sell the artwork at a price consistent with proven authentic artwork.

72.     On or about November 12, 2013, AHMAD acquired a piece of art created by Brooklyn Artist-2 from a New York-based auction house ("New York Auction House-1"), an entity the identity of which is known to the Grand Jury, for $100,000  An image of the artwork is depicted below:



73.     On or about December 10, 2019, defendant SUNDAR NAGARAJAN sent an email to defendants ALI SAID MOSSALEM and HIND NAZEM AHMAD, as well as to New York Auction House-1, which stated, in relevant part, "We need the certificate of authenticity and any other paperwork relating to [Brooklyn Artist-2's] work. This we bought in New York auction."

74.     On or about December 19, 2019, after defendant NAZEM AHMAD was designated by OFAC, defendant HIND NAZEM AHMAD contacted a Brooklyn-based art studio associated with Brooklyn Artist-2, an entity the identity of which is known to the Grand Jury, and requested the COA be sent via express courier.  HIND offered to make payment for shipping via a financial technology company located in the United States.  The studio provided a picture of the COA via email; the COA included the statement "This document authenticates that the work pictured above is original artwork created in Brooklyn, New York, USA by the artist [Brooklyn Artist-2]."

75.     The defendant NAZEM AHMAD subsequently utilized Lebanon-based Artual Gallery to sell Brooklyn Artist-2's artwork for $165,000.

e.      AHMAD's Acquisition of Artwork from California Artist-1

76.     In or about July and August 2021, the defendants NAZEM AHMAD and ALI SAID MOSSALEM were involved in the purchase of artwork from a California-based artist, an individual whose identity is known to the Grand Jury ("California Artist-1").

77.     On or about September 16, 2021, California Artist-1 emailed the defendant NAZEM AHMAD an invoice listing the sender's address in California and listing the recipient as "Nazem."  The invoice reflected the purchase of four pieces of art for $23,200 and requested a wire to the artist's account at a U.S.-based bank.  The defendant NAZEM AHMAD subsequently forwarded this email and invoice to defendant ALI SAID MOSSALEM.  Images of two of the pieces of art acquired from California Artist-1 are depicted below:

 

78.     On or about October 17, 2021, the artwork acquired by NAZEM AHMAD from California Artist-1 was exported from the United States to an entity in Lebanon.  On or about October 31, 2021, the defendant NAZEM AHMAD communicated with California Artist-1 and confirmed that AHMAD had received the artwork.

      f.     <u>AHMAD's Acquisition of Artwork by New York Artist-1 and New York Artist-2 Through HIND NAZEM AHMAD's Art Galleries</u>

79.     The defendant HIND NAZEM AHMAD, through her operation of Artual Gallery and Four You Gallery, and together with defendants SARYA NEMAT MARTIN, ALI SAID MOSSALEM and MOHAMAD HASSAN ISMAIL, facilitated defendant NAZEM AHMAD's acquisition of U.S. artwork after AHMAD had been designated in December 2019.

80.     On or about and between February 19, 2020 and March 11, 2020, Four You Gallery hosted an exhibition in Dubai of artwork by New York Artist-1.  Defendant SARYA NEMAT MARTIN, an employee of Four You Gallery, invited defendant NAZEM AHMAD to the exhibition.

81.     On or about March 10, 2020, the defendant ALI MOSSSALEM sent himself an email, which contained a list of artwork acquired by defendant NAZEM AHMAD.  The list reflected that AHMAD had acquired nine pieces of New York Artist-1's artwork, and one piece of artwork from another U.S.-based artist, for $127,662.50.  The "public price" reflected in the spreadsheet indicated that the artwork was publicly valued at, in total, $200,045.

82.     On or about March 11, 2020, the defendant ALI SAID MOSSALEM sent himself an email, which contained an attached spreadsheet titled "Dida Artual Account Final 11 March 2020."  The spreadsheet reflected, in part, that defendant NAZEM AHMAD purchased the above-referenced artwork by New York Artist-1 from Artual Gallery and defendant HIND NAZEM AHMAD.

83.     In or around June 2020 and August 2020, the defendant MOHAMMAD HASSAN ISMAIL coordinated the shipment of multiple pieces of art—created by New York Artist-1 and another artist who lives and works in Putnam County, New York ("New York Artist-2"), an individual whose identity is known to the Grand Jury—from Four You Gallery to an entity

in Lebanon.  Notwithstanding that the shipment was from Four Your Gallery, ISMAIL identified Artual Gallery (misspelling it as "Artul Gallery") as the art gallery involved in the shipment.  A packing list for the shipment of artwork identified several pieces of artwork by reference numbers that matched the reference numbers for New York Artist-1 artwork that defendant NAZEM AHMAD had purchased from the exhibition hosted by defendant HIND NAZEM AHMAD's art galleries.  Images of two pieces of artwork obtained by AHMAD from New York Artist-2 are depicted below:



84.     In or around January 2021 and February 2021, the defendant NAZEM AHMAD posted photographs and videos to a social media account showing various pieces of artwork by New York Artist-1 hanging in his residence in Beirut, Lebanon.

85.     Records from the AHMAD Criminal Organization reflect an expenditure of "1075", i.e. $1,075, that is described as "Shipment [from] Dubai to Beirut of [New York Artist-1] available artworks + client artworks + [Defendant HIND NAZEM AHMAD] artwork" and an expenditure of "61475", i.e. $61,475, described as "Paid to [New York Artist-1] on 12.08.2020."

B.     The Defendants' Use of the U.S. Financial System to Facilitate the Acquisition of Artwork by Sanctioned Defendant NAZEM AHMAD

86.     The defendants NAZEM AHMAD, MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL and ALI SAID MOSSALEM, together with others, also caused U.S. financial institutions to provide financial services to, on behalf of, and for the benefit of AHMAD to facilitate AHMAD's acquisition of artwork.

87.     For example, in or about and between May 2021 and November 2021, defendant NAZEM AHMAD negotiated the purchase of 10 commissioned works of art by a Nigerian-based artist ("Nigerian Artist-1"), an individual whose identity is known to the Grand Jury, for $35,000, through the use of a corporation that was ostensibly controlled by defendant MOHAMAD HASSAN ISMAIL.  AHMAD sent confirmation to the artist of partial payment via wire transfer for the artwork, which was paid through another corporate entity.  The wire transfer confirmation indicated that the transaction involved a U.S. financial institution located in New York, New York.

88.     In or about and between May 2021 and June 2021, defendants NAZEM AHMAD and ALI SAID MOSSALEM received an invoice directed to AHMAD that sought the payment of $11,514 for works of art by Nigerian-based artist ("Nigerian Artist-2"), an individual whose identity is known to the Grand Jury.  MOSSALEM provided confirmation of payment by wire transfer.  The wire transfer that paid for the artwork purchased by AHMAD was facilitated by a U.S. financial institution located in New York, New York.  An image of one of the pieces of artwork acquired by AHMAD through the services of U.S. financial institutions is depicted below:



89.     In or about and between August 2020 and September 2020, defendant NAZEM AHMAD received an invoice for $8,450 from an art gallery located in Iceland ("Iceland Art Gallery-1"), an entity the identity of which is known to the Grand Jury, for artwork that AHMAD had acquired through White Star DMCC.  AHMAD, with the assistance of defendant ALI SAID MOSSALEM, paid Iceland Art Gallery-1 via a wire transfer from funds associated with White Star DMCC.  The wire transfer between AHMAD and Iceland Art Gallery-1 was facilitated by a U.S. financial institution located in New York, New York.

90.     In or about October 2020, the defendant NAZEM AHMAD received an invoice for $180,000 from Iceland Art Gallery-1 for six paintings by a United States-based artist

("U.S. Artist-1"), an individual whose identity is known to the Grand Jury.  The email attaching the invoice indicated that AHMAD had commissioned the creation of this artwork.  The invoice was addressed to White Star DMCC.  After requesting that the invoice be converted to Euros, defendant ALI SAID MOSSALEM emailed a wire transfer confirmation to Iceland Art Gallery-1 indicating White Star DMCC had made partial payment for the artwork.  A subsidiary of a New York-based U.S. financial institution was an intermediary party in the financial transaction.

VII.    Undervaluation of Goods in U.S. Customs Forms

91.     As part of the conspiracy, the AHMAD Criminal Organization undervalued artwork exported from the United States, in violation of U.S. customs laws.

92.     In total, the AHMAD Criminal Organization undervalued goods that were exported for their benefit, including artwork, by more than $160,000, a sum that does not account for artwork for which none of the required export paperwork was filed.

A.      Undervaluation of Artwork as Part of Sanctions Evasion Scheme

93.     The defendants NAZEM AHMAD, MOHAMAD HASSAN ISMAIL, MOHAMAD HIJAZI and ALI SAID MOSSALEM, together with others, conspired to undervalue artwork in U.S. export records for the purpose of furthering the conspiracy to evade U.S. sanctions against AHMAD.

94.     For example, on or about May 16, 2021, the defendant NAZEM AHMAD discussed with the owner of Chicago Art Gallery-1 that AHMAD had received an invoice for $45,000 for artwork that he had purchased, but customs declarations for that artwork reflected a value of $1,200.  AHMAD threatened to publicize this information if the owner of Chicago Art Gallery-1 did not agree to send in a timely fashion AHMAD paintings that he had purchased.

95.     On or about July 27, 2021, defendant NAZEM AHMAD provided a draft email to Chicago Art Gallery-1 to be sent to defendant MOHAMAD HASSAN ISMAIL, which

stated, in relevant part, that two invoices were attached and works of art AHMAD was acquiring had "no commercial value." The assigned total value of $16,500 for this artwork was for "lebanese customs only."

96.     On or about March 11, 2022, Chicago Art Gallery-1 provided the defendant NAZEM AHMAD an invoice addressed to Baconia SARL that noted the sale of 21 works of art for $86,600. In April 2022, the defendant MOHAMMAD HASSAN ISMAIL possessed a copy of this invoice.

97.     On March 19, 2022, a shipment from Chicago Art Gallery-1 was exported from John F. Kennedy International Airport in Queens, New York to a company in Lebanon controlled by the defendant NAZEM AHMAD. The export was declared to be wooden baby cribs valued at $52,600.

B.     Other Instances of Undervaluation of Artwork

98.     Even before defendant NAZEM AHMAD was sanctioned in December 2019 for his support of and provision of services to Hizballah, the AHMAD Criminal Organization conspired to undervalue artwork exported from the United States in violation of U.S. customs laws.

99.     For example, on or about January 14, 2014, an art gallery located in California ("California Art Gallery-1") an entity they identity of which is known to the Grand Jury, generated an invoice for $135,000 to defendant NAZEM AHMAD for three paintings. In an email that defendant SUNDAR NAGARAJAN sent approximately two months later, on or about March 4, 2014, NAGARAJAN requested that the art gallery "make the invoice for USD5000/- (Five thousands only) – You can mention as Decorative Item."

100.     On March, 12, 2014, California Art Gallery-1 exported paintings from Los Angeles International Airport to defendant ALI SAID MOSSALEM in Lebanon. The export was valued at $50,000.

VIII.    The Foreign Tax Avoidance Scheme

101.    The AHMAD Criminal Organization engaged in fraudulent conduct that was designed to evade taxes levied by foreign countries.

102.    For example, in or about and between March 2021 and April 2021, the defendant NAZEM AHMAD negotiated the purchase of artwork from Nigerian Artist-2.  AHMAD agreed to pay $33,000 for three works of art and identified Baconia SARL as the delivery recipient for the artwork.  When the artist requested AHMAD's full name, AHMAD responded "you don't need to put my name it's in the name of a company Baconia SARL" because "in personal name the tax is highest."  On May 2, 2021, AHMAD confirmed that he received artwork shipped by the artist.

103.    In or about and between August and September 2019, the defendant SARYA NEMAT MARTIN, acting as an employee of Artual Gallery, an art gallery operated by defendant HIND NAZEM AHMAD, acquired 12 works of art from a New York-based artist ("New York Artist-3"), an individual whose identity is known to the Grand Jury, on a consignment agreement for $97,500.  MARTIN directed that New York Artist-3 list the shipment's value as "VERY low please," because "the customs are quite hight [sic] in Lebanon," and also asked that the artist falsely identify the artwork as "decorative items."  In response, New York Artist-3 stated that he would "list [the artwork] with a low value and [as] decorative items."  When the artwork was detained by Lebanese customs, MARTIN directed New York Artist-3 to provide a receipt that falsely claimed that Artual Gallery obtained the artwork for $300.

104.    In or around June 2017, an artist in the United States emailed the defendant HIND NAZEM AHMAD about two different pieces of art.  On or about June 21, 2017, HIND replied that she wanted to purchase the two pieces of art and requested that an invoice be provided.  HIND noted that she had carbon copied defendant SUNDAR NAGARAJAN because

NAGARAJAN "can tell you what's the most accurate way to ship them to beirut so I don't have to pay the tax charges high." Additionally, HIND directed that the material be shipped to offices for Nour Holding, an entity subsequently sanctioned by OFAC for its association with defendant NAZEM AHMAD, and requested that the artist "not put any invoice inside" the package.

COUNT ONE
(Conspiracy to Defraud the United States)

105.    The allegations contained in paragraphs one through 104 are realleged and incorporated as if fully set forth in this paragraph.

106.    In or about and between December 2019 and August 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NAZEM AHMAD, also known as "N.A.," "Naz," "Naz Ahmad," "Nazem Ali Ahmad," "Nazem Saeed Ahmad," "Nazim Sa'id Ahmad," "Nizam Saed Ahmad," "Nazem Said Ahmed," "Nazem Saied Ahmed," "Nazeem Said Ahmad" and "Kariumu Muhamadi," FIRAS MICHAEL AHMAD, also known as "Firas Ahmed" and "Firas Nazem Ahmad," HIND NAZEM AHMAD, also known as "Dida Ahmad," "Hind El Ris," "Hind El-Riz" and "Julie," RAMI YAACOUB BAKER, also known as "Ramy Kamel Yaqoub Baker," MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, SARYA NEMAT MARTIN, also known as "Sarya N. Marie," ALI SAID MOSSALEM and SUNDAR NAGARAJAN, also known as "Nagarajan Sundar Poongulam Kasiviswanathan Naga" and "Sundar Poongulam K. Nagarajan," together with others, did knowingly and willfully conspire to defraud the United States by impairing, impeding, obstructing and defeating, through deceitful and dishonest means, the lawful governmental functions of OFAC, an agency of the United States, in the enforcement of statutes, orders and regulations, and the issuance of licenses and authorizations, relating to persons blocked under the authority of Executive Order 13224.

107.    In furtherance of the conspiracy and to affect its objects, within the Eastern District of New York and elsewhere, the defendants NAZEM AHMAD, FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, SARYA NEMAT MARTIN, ALI SAID MOSSALEM and SUNDAR NAGARAJAN, together with others, did commit and cause the commission of, among others, the following:

OVERT ACTS

(a)    On or about December 19, 2019, HIND contacted a Brooklyn-based art studio associated with Brooklyn Artist-2 and requested a Certificate of Authenticity for a piece of artwork.

(b)    In or about and between January 2020 and August 2021, BAKER operated Mega Gems Pty Ltd.

(c)    In or about and between January 2020 and August 2022, FIRAS operated Mega Gems Pty Ltd.

(d)    On or about February 11, 2020, MARTIN sent an electronic message to AHMAD inviting him to attend an exhibition in Dubai of New York Artist-1's work.

(e)    On or about February 24, 2021, AHMAD sent electronic messages to New York Artist-1 about acquiring artwork from the United States.

(f)    On or about March 23, 2021, Redacted Company-2 submitted a 45.56-carat, pear modified brilliant diamond to a Diamond Grading Company-1 facility located in New York, New York.

(g)    On or about April 26, 2021, Diamond Grading Company-1 caused an Electronic Export Information form to be filed in connection with the shipment of a 46-carat

diamond with a listed value of $80,000,000, to Redacted Company-2     , at an address in the United Arab Emirates, through John F. Kennedy International Airport in Queens, New York.

 (h) On or about April 26, 2021, a 45.56-carat was exported out of the United States, through John F. Kennedy International Airport, to Redacted Company-2

 (i) On or about and between April 27, 2021 and May 10, 2021, AHMAD sent electronic messages to the owner of Chicago Art Gallery-1 about acquiring artwork from the United States.

 (j) On or about and between May 26, 2021 and July 13, 2021, MOSSALEM sent electronic messages regarding the shipment of artwork from Chicago Art Gallery-1.

 (k) On or about July 27, 2021, AHMAD provided instructions to Chicago Art Gallery-1 for the shipment of U.S.-based paintings, through ISMAIL, to Lebanon.

 (l) In or about August 2021, MARTIN sent email communications to New York Artist-1 related to the acquisition of artwork from the United States for AHMAD.

 (m) On or about August 6, 2021, MARTIN sent New York Artist-1 an electronic message confirming that AHMAD had purchased several of New York Artist-1's works through Four You Gallery.  Some or all of these works were created in the United States, and invoices for the works made out to Four You Gallery reflected that the art was purchased in U.S. dollars.

 (n) On or about November 10, 2021, HIJAZI made a payment to a Belgian-based art seller, using a credit card account denominated in U.S. dollars and held in the name of White Star DMCC.

(o)     On January 3, 2022, ISMAIL sent an email to a shipping company to facilitate the shipment of sculptures from the United States to Lebanon.  At least four of the sculptures shipped were invoiced to AHMAD on January 6, 2022.

(p)     On or about January 20, 2022, Diamond Grading Company-1 caused an Electronic Export Information form to be filed in connection with the shipment of 13 carats of diamonds with a listed value of $313,150, to Mega Gems Pty Ltd., at an address in South Africa, through John F. Kennedy International Airport in Queens, New York.

(q)     On or about March 5, 2022, NAGARAJAN sent MOSSALEM an email attaching a spreadsheet reflecting the ledger for the Beirut office of the AHMAD Criminal Organization.  The spreadsheet reflected transfers to AHMAD's family members and co-conspirators, diamond-related transactions, art purchases, payments to shipping services, and numerous cash transfers to "lebanon office."  The spreadsheet reflected payments to numerous entities described herein.

(r)     On or about June 6, 2022, Redacted Company-2 submitted a 21.86-carat, pear brilliant diamond to a Diamond Grading Company-1 facility located in New York, New York.

(s)     On or about July 12, 2022, Mega Gems Pty Ltd. submitted a 3.08-carat, round brilliant diamond to a Diamond Grading Company-1 facility located in New York, New York.

(t)     On or about July 26, 2022, Redacted Company-1  submitted a 3.51-carat, round brilliant diamond to a Diamond Grading Company-1 facility located in Johannesburg, South Africa.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Conspiracy to Violate IEEPA – Diamond-Related Transactions in Violation of Global
Terrorism Sanctions Regulations)

108.    The allegations contained in paragraphs one through 104 are realleged and incorporated as if fully set forth in this paragraph.

109.    In or about and between December 2019 and August 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NAZEM AHMAD, also known as "N.A.," "Naz," "Naz Ahmad," "Nazem Ali Ahmad," "Nazem Saeed Ahmad," "Nazim Sa'id Ahmad," "Nizam Saed Ahmad," "Nazem Said Ahmed," "Nazem Saied Ahmed," "Nazeem Said Ahmad" and "Kariumu Muhamadi, "FIRAS MICHAEL AHMAD, also known as "Firas Ahmed" and "Firas Nazem Ahmad," HIND NAZEM AHMAD, also known as "Dida Ahmad," "Hind El Ris," "Hind El-Riz" and "Julie, "RAMI YAACOUB BAKER, also known as "Ramy Kamel Yaqoub Baker," MOHAMAD HIJAZI, ALI SAID MOSSALEM and SUNDAR NAGARAJAN, also known as "Nagarajan Sundar Poongulam Kasiviswanathan Naga" and "Sundar Poongulam K. Nagarajan," together with others, did knowingly and willfully conspire to violate the IEEPA, contrary to 50 U.S.C. § 1705, Executive Order 13224, and 31 C.F.R. §§ 594.201, 594.204, and 594.205.

110.    It was a part and an object of the conspiracy that defendants NAZEM AHMAD, FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, ALI SAID MOSSALEM and SUNDAR NAGARAJAN, together with others, did knowingly and willfully violate the IEEPA, and the regulations promulgated thereunder, to wit: AHMAD, FIRAS, HIND, BAKER, HIJAZI, MOSSALEM, NAGARAJAN and their co-conspirators knowingly and willfully caused U.S. persons, entities and financial institutions to provide funds, goods and services to and for the benefit of NAZEM AHMAD, a

Specially Designated National, without first obtaining the required approval of OFAC, contrary to Executive Order 13224 and 31 C.F.R. §§ 594.201, 594.204(a), and 594.205.

111.    It was further a part and an object of the conspiracy that defendants NAZEM AHMAD, FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, ALI SAID MOSSALEM and SUNDAR NAGARAJAN, together with others, did knowingly and willfully violate the IEEPA, and the regulations promulgated thereunder, to wit; AHMAD, FIRAS, HIND, BAKER, HIJAZI, MOSSALEM, NAGARAJAN and their co-conspirators did knowingly and willfully cause U.S. persons, entities and financial institutions to receive funds, goods and services from AHMAD, a Specially Designated National, without first obtaining the required approval of OFAC, contrary to Executive Order 13224 and 31 C.F.R. §§ 594.201, 594.204(b), and 594.205.

112.    It was further a part and an object of the conspiracy that defendants NAZEM AHMAD and FIRAS MICHAEL AHMAD, together with others, did knowingly and willfully violate the IEEPA, and the regulations promulgated thereunder, to wit; AHMAD, FIRAS, and their co-conspirators, did knowingly and willfully engage in one or more transactions to evade and avoid, and attempt to evade and avoid, the requirements of U.S. law with respect to the provision of funds, goods and services to and for the benefit of, and the receipt of funds, goods and services from, AHMAD, a Specially Designated National, contrary to Executive Order 13224 and 31 C.F.R. § 594.205.

(Title 50, United States Code, Sections 1705(a) and 1705(c); Title 18, United States Code, Sections 3551 et seq.)

COUNT THREE
(Conspiracy to Violate IEEPA – Acquisition of Artwork and Related Transactions in Violation
of Global Terrorism Sanctions Regulations)

113.    The allegations contained in paragraphs one through 104 are realleged and

incorporated as if fully set forth in this paragraph.

114.    In or about and between December 2019 and August 2022, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants

NAZEM AHMAD, also known as "N.A.," "Naz," "Naz Ahmad," "Nazem Ali Ahmad," "Nazem

Saeed Ahmad," "Nazim Sa'id Ahmad," "Nizam Saed Ahmad," "Nazem Said Ahmed," "Nazem

Saied Ahmed," "Nazeem Said Ahmad" and "Kariumu Muhamadi," FIRAS MICHAEL AHMAD,

also known as "Firas Ahmed" and "Firas Nazem Ahmad," HIND NAZEM AHMAD, also known

as "Dida Ahmad," "Hind El Ris," "Hind El-Riz" and "Julie," RAMI YAACOUB BAKER, also

known as "Ramy Kamel Yaqoub Baker," MOHAMAD HIJAZI, MOHAMAD HASSAN

ISMAIL, SARYA NEMAT MARTIN, also known as "Sarya N. Marie," ALI SAID MOSSALEM

and SUNDAR NAGARAJAN, also known as "Nagarajan Sundar Poongulam Kasiviswanathan

Naga" and "Sundar Poongulam K. Nagarajan,"  together with others, did knowingly and willfully

conspire to violate the IEEPA, contrary to 50 U.S.C. § 1705, Executive Order 13224, and 31 C.F.R.

§§ 594.201, 594.204, and 594.205.

115.    It was a part and an object of the conspiracy that defendants NAZEM

AHMAD, FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER,

MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, SARYA NEMAT MARTIN, ALI SAID

MOSSALEM and SUNDAR NAGARAJAN, together with others, did knowingly and willfully

violate the IEEPA, and the regulations promulgated thereunder, to wit; AHMAD, FIRAS, HIND,

BAKER, HIJAZI, ISMAIL, MARTIN, MOSSALEM, NAGARAJAN and their co-conspirators,

did knowingly and willfully cause U.S. persons, entities and financial institutions to provide funds,

goods and services to and for the benefit of AHMAD, a Specially Designated National, without first obtaining the required approval of OFAC, contrary to Executive Order 13224 and 31 C.F.R. §§ 594.201, 594.204(a), and 594.205.

116.     It was further a part and an object of the conspiracy that defendants NAZEM AHMAD, FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, SARYA NEMAT MARTIN, ALI SAID MOSSALEM and SUNDAR NAGARAJAN, together with others, did knowingly and willfully violate the IEEPA, and the regulations promulgated thereunder, to wit; AHMAD, FIRAS, HIND, BAKER, HIJAZI, ISMAIL, MARTIN, MOSSALEM, NAGARAJAN and their co-conspirators, did knowingly and willfully cause U.S. persons, entities and financial institutions to receive funds, goods and services from AHMAD, a Specially Designated National, without first obtaining the required approval of OFAC, contrary to Executive Order 13224 and 31 C.F.R. §§ 594.201, 594.204(b), and 594.205.

117.     It was further a part and an object of the conspiracy that defendants NAZEM AHMAD, FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, SARYA NEMAT MARTIN, ALI SAID MOSSALEM and SUNDAR NAGARAJAN, together with others, did knowingly and willfully violate the IEEPA, and the regulations promulgated thereunder, to wit; AHMAD, FIRAS, HIND, BAKER, HIJAZI, ISMAIL, MARTIN, MOSSALEM, NAGARAJAN and their co-conspirators, did knowingly and willfully engage in one or more transactions to evade and avoid, and attempt to evade and avoid, the requirements of U.S. law with respect to the provision of funds, goods and

services to and for the benefit of, and the receipt of funds, goods and services from, AHMAD, a

Specially Designated National, contrary to Executive Order 13224 and 31 C.F.R. § 594.205.

      (Title 50, United States Code, Sections 1705(a) and 1705(c); Title 18, United

States Code, Sections 3551 et seq.)

COUNT FOUR
(Smuggling Goods from the United States – Artwork and Related Goods)

      118.    The allegations contained in paragraphs one through 104 are realleged and

incorporated as if fully set forth in this paragraph.

      119.    In or about and between December 2019 and August 2022, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants

NAZEM AHMAD, also known as "N.A.," "Naz," "Naz Ahmad," "Nazem Ali Ahmad," "Nazem

Saeed Ahmad," "Nazim Sa'id Ahmad," "Nizam Saed Ahmad," "Nazem Said Ahmed," "Nazem

Saied Ahmed," "Nazeem Said Ahmad" and "Kariumu Muhamadi," HIND NAZEM AHMAD, also

known as "Dida Ahmad," "Hind El Ris," "Hind El-Riz" and "Julie," MOHAMAD HASSAN

ISMAIL, ALI SAID MOSSALEM and SARYA NEMAT MARTIN, also known as "Sarya N.

Marie," together with others, did fraudulently and knowingly export and send from the United

States, and cause to be exported and sent from the United States, merchandise, articles and objects,

to wit: artwork and related goods, contrary to United States laws and regulations, to wit: Title 50,

United States Code, Sections 1705 and Title 31, Code of Federal Regulations, Sections 594.201,

594.204, and 594.205, and did fraudulently and knowingly receive, conceal and facilitate the

transportation and concealment of such merchandise, articles and objects, prior to exportation,

knowing the same to be intended for exportation, contrary to such United States laws and

regulations.

      (Title 18, United States Code, Sections 554(a), 2 and 3551 et seq.)

## COUNT FIVE
(Smuggling Goods from the United States – Diamonds)

120.     The allegations contained in paragraphs one through 104 are realleged and incorporated as if fully set forth in this paragraph.

121.     In or about and between December 2019 and August 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NAZEM AHMAD, also known as "N.A.," "Naz," "Naz Ahmad," "Nazem Ali Ahmad," "Nazem Saeed Ahmad," "Nazim Sa'id Ahmad," "Nizam Saed Ahmad," "Nazem Said Ahmed," "Nazem Saied Ahmed," "Nazeem Said Ahmad" and "Kariumu Muhamadi," FIRAS MICHAEL AHMAD, also known as "Firas Ahmed" and "Firas Nazem Ahmad," RAMI YAACOUB BAKER, also known as "Ramy Kamel Yaqoub Baker," MOHAMAD HIJAZI, ALI SAID MOSSALEM and SUNDAR NAGARAJAN, also known as "Nagarajan Sundar Poongulam Kasiviswanathan Naga" and "Sundar Poongulam K. Nagarajan," together with others, did fraudulently and knowingly export and send from the United States, and cause to be exported and sent from the United States, merchandise, articles and objects, to wit: diamonds, contrary to United States laws and regulations, to wit: Title 50, United States Code, Sections 1705 and Title 31, Code of Federal Regulations, Sections 594.201, 594.204 and 594.205, and did fraudulently and knowingly receive, conceal and facilitate the transportation and concealment of such merchandise, articles and objects, prior to exportation, knowing the same to be intended for exportation, contrary to such United States laws and regulations.

(Title 18, United States Code, Sections 554(a), 2 and 3551 et seq.)

## COUNT SIX
(Unlawful Importation)

122.     The allegations contained in paragraphs one through 104 are realleged and incorporated as if fully set forth in this paragraph.

123.    In or about and between December 2019 and August 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NAZEM AHMAD, also known as "N.A.," "Naz," "Naz Ahmad," "Nazem Ali Ahmad," "Nazem Saeed Ahmad," "Nazim Sa'id Ahmad," "Nizam Saed Ahmad," "Nazem Said Ahmed," "Nazem Saied Ahmed," "Nazeem Said Ahmad" and "Kariumu Muhamadi," FIRAS MICHAEL AHMAD, also known as "Firas Ahmed" and "Firas Nazem Ahmad," RAMI YAACOUB BAKER, also known as "Ramy Kamel Yaqoub Baker," MOHAMAD HIJAZI, ALI SAID MOSSALEM and SUNDAR NAGARAJAN, also known as "Nagarajan Sundar Poongulam Kasiviswanathan Naga" and "Sundar Poongulam K. Nagarajan," together with others, did fraudulently and knowingly import and bring into the United States, and cause to be imported and brought into the United States, merchandise contrary to law, and did receive, conceal, buy, sell and facilitate the transportation, concealment and sale of such merchandise after importation, knowing such merchandise to have been imported and brought into the United States contrary to law, to wit: diamonds, in violation of Title 50, United States Code, Sections 1705 and Title 31, Code of Federal Regulations, Sections 594.201, 594.204 and 594.205.

(Title 18, United States Code, Sections 545, 2 and 3551 et seq.)

COUNT SEVEN
(Wire Fraud Conspiracy – the Sanctions Evasion Scheme)

124.    The allegations contained in paragraphs one through 104 are realleged and incorporated as if fully set forth in this paragraph.

125.    In or about and between December 2019 and August 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NAZEM AHMAD, also known as "N.A.," "Naz," "Naz Ahmad," "Nazem Ali Ahmad," "Nazem Saeed Ahmad," "Nazim Sa'id Ahmad," "Nizam Saed Ahmad," "Nazem Said Ahmed," "Nazem

Saied Ahmed," "Nazeem Said Ahmad" and "Kariumu Muhamadi," MOHAMAD HASSAN ISMAIL and ALI SAID MOSSALEM, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud one or more U.S. entities, to wit: United States Department of Treasury, United States Department of Commerce and United States Customs & Border Protection authorities, by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: electronic communications, emails and other online communications and monetary transfers in and through the Eastern District of New York and elsewhere, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

<u>COUNT EIGHT</u>
(Wire Fraud Conspiracy – the Foreign Tax Evasion Scheme)

126.    The allegations contained in paragraphs one through 104 are realleged and incorporated as if fully set forth in this paragraph.

127.    In or about and between February 2014 and August 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants the defendants NAZEM AHMAD, also known as "N.A.," "Naz," "Naz Ahmad," "Nazem Ali Ahmad," "Nazem Saeed Ahmad," "Nazim Sa'id Ahmad," "Nizam Saed Ahmad," "Nazem Said Ahmed," "Nazem Saied Ahmed," "Nazeem Said Ahmad" and "Kariumu Muhamadi," HIND NAZEM AHMAD, also known as "Dida Ahmad," "Hind El Ris," "Hind El-Riz" and "Julie," and SUNDAR NAGARAJAN, also known as "Nagarajan Sundar Poongulam Kasiviswanathan Naga" and "Sundar Poongulam K. Nagarajan," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud one or more foreign governments, to wit: the

Republic of Lebanon and the United Arab Emirates, by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: electronic communications, emails and other online communications and monetary transfers in and through the Eastern District of New York and elsewhere, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT NINE
(Money Laundering Conspiracy)

128.    The allegations contained in paragraphs one through 104 are realleged and incorporated as if fully set forth in this paragraph.

129.    In or about and between December 2019 and August 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NAZEM AHMAD, also known as "N.A.," "Naz," "Naz Ahmad," "Nazem Ali Ahmad," "Nazem Saeed Ahmad," "Nazim Sa'id Ahmad," "Nizam Saed Ahmad," "Nazem Said Ahmed," "Nazem Saied Ahmed," "Nazeem Said Ahmad" and "Kariumu Muhamadi," FIRAS MICHAEL AHMAD, also known as "Firas Ahmed" and "Firas Nazem Ahmad," HIND NAZEM AHMAD, also known as "Dida Ahmad," "Hind El Ris," "Hind El-Riz" and "Julie," RAMI YAACOUB BAKER, also known as "Ramy Kamel Yaqoub Baker," MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, ALI SAID MOSSALEM and SUNDAR NAGARAJAN, also known as "Nagarajan Sundar Poongulam Kasiviswanathan Naga" and "Sundar Poongulam K. Nagarajan" together with others, did knowingly and intentionally conspire to (a) transmit and transfer monetary instruments and funds from one or more places outside the United States, to wit: the United Arab Emirates and

South Africa, to one or more places in the United States, to wit: New York and Illinois, with the intent to promote the carrying on of specified unlawful activity, to wit: conspiracy to violate IEEPA as charged in Counts Two and Three, contrary to Title 18, United States Code, Section 1956(a)(2)(A); and (b) transmit and transfer monetary instruments and funds from one or more places outside the United States, to wit: the United Arab Emirates and South Africa, to and through one or more places in the United States, to wit: New York and Illinois, knowing that the monetary instruments and funds involved in the transmission and transfer represented the proceeds of some form of unlawful activity and knowing that such transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION<br>AS TO COUNTS TWO THROUGH FIVE, SEVEN AND EIGHT

130.    The United States hereby gives notice to the defendants NAZEM AHMAD, FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, SARYA NEMAT MARTIN, ALI SAID MOSSALEM and SUNDAR NAGARAJAN that upon their conviction of any of the offenses charged in Counts Two through Five, Seven and Eight, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of any such offenses, to forfeit any property, real or personal, constituting or derived from, proceeds obtained directly or indirectly as a result of such offenses, including but not limited to: more than 450 diamonds, as described in

Appendix A, and all proceeds traceable thereto; and more than 100 pieces of artwork, as described in Appendix B, and all proceeds traceable thereto.

131.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c)).

<u>CRIMINAL FORFEITURE ALLEGATION AS TO COUNT SIX</u>

132.     The United States hereby gives notice to the defendants, NAZEM AHMAD, FIRAS MICHAEL AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, ALI SAID MOSSALEM and SUNDAR NAGARAJAN that upon their conviction of the offense charged in Count Six, the government will seek forfeiture in accordance with: (a) Title 18, United States Code, Section 982(a)(2)(B), which requires any person convicted of such offenses to forfeit any property constituting, or derived from proceeds the person obtained directly or indirectly, as the result of such offenses; and (b) Title 18, United States Code, Section 545, which requires any

person convicted of such offenses to forfeit any merchandise introduced into the United States in violation of such offenses, or the value thereof, including but not limited to more than 450 diamonds, as described in Appendix A, and all proceeds traceable thereto.

133.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 545, 982(a)(2)(B) and 982(b)(1); Title 21, United States Code, Section 853(p)).

<u>CRIMINAL FORFEITURE ALLEGATION AS TO COUNT NINE</u>

134.    The United States hereby gives notice to the defendants, NAZEM AHMAD, FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI, MOHAMAD HASSAN ISMAIL, ALI SAID MOSSALEM and SUNDAR NAGARAJAN that upon their conviction of the offense charged in Count Nine, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which

requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to:  more than 450 diamonds, as described in Appendix A, and all proceeds traceable thereto; and more than 100 pieces of artwork, as described in Appendix B, and all proceeds traceable thereto.

135.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of

any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p)).


A TRUE BILL


_____

FOREPERSON


_____

BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. #2018R000578
FORM DBD-34
JUN. 85

No. 23-CR-

---

### UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

---

THE UNITED STATES OF AMERICA

*vs.*

*NAZEM AHMAD, FIRAS MICHAEL AHMAD, HIND NAZEM AHMAD, RAMI YAACOUB BAKER, MOHAMAD HIJAZI,  MOHAMAD HASSAN ISMAIL, SARYA NEMAT MARTIN, ALI SAID MOSSALEM, and SUNDAR NAGARAJAN,*

Defendants.

---

### INDICTMENT

(T. 18, U.S.C., §§ 371, 545, 554(a), 981(a)(1)(C), 982(a)(1), 982(a)(2)(B), 982(b)(1), 1349, 1956(h), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c); T. 50, U.S.C., §§ 1705(a) and 1705(c))

*A true bill.*

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

*Foreperson*

---

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day,*

*of* _ _ _ _ _ _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

*Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

---

***Craig R. Heeren and Nicholas J. Moscow,***
***Assistant U.S. Attorneys (718) 254-7000***